**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK DIVISION**

| | |
|---|---|
| JOEVANNIE SOLIS, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| LATIUM NETWORK, INC., a Delaware corporation, DAVID JOHNSON, and MATTHEW CARDEN, | ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 2:18-cv-10255

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Joevannie Solis ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this Class Action Complaint against Defendants Latium Network, Inc. ("Latium"), David Johnson, and Matthew Carden (collectively, "Defendants"), and complains and alleges upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by counsel.

## NATURE OF THE ACTION

1.      Plaintiff brings this action on behalf of himself and all other similarly situated investors against Defendants for their violation of Section 5 of the Securities Act of 1933 (the "Securities Act"). Specifically, in connection with the Latium initial coin offering ("Latium ICO"), Defendants raised over $17 million by offering and

selling unregistered securities, in the form of LatiumX ("LATX") tokens, in direction violation of the Securities Act.

2.    While Defendants attempt to portray the Latium ICO as a sale of "utility-based tokens," the Latium ICO was indeed an offer and sale of securities. Among other indicia of a securities offering, Defendants touted that the LATX tokens received in exchange for their investments would be worth more than the monies they paid. Additionally, Defendants have created a sense of urgency for investors to make their investments to capitalize on the profit potential of the investment.

3.    The Securities Act's registration requirements are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions.

4.    Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security, unless an exemption from registration applies. The Latium ICO was an offer and sale of unregistered securities without an exemption, and Defendants are strictly liable under Section 12(a)(1) of the Securities Act.

5.    Proof of Defendants' deceptive activity and calculated deprivation of investors' rights and protections under the federal securities laws are not required or determinative as to Plaintiff's claim. Defendants are strictly liable for the offering and selling of unregistered securities in connection with the Latium ICO. The urgent need for immediate judicial intervention is to preserve Plaintiff's and Latium ICO investors' significant financial interests and to rectify existing and future irreparable

harm to Plaintiff and Latium ICO investors. Plaintiff, on behalf of himself and all similarly situated Latium ICO investors, seeks compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments into the Latium ICO, and securing and conserving such funds until repayment.

## PARTIES

6.      Plaintiff Joevannie Solis is a citizen of the State of New Jersey. At relevant times to this matter, he resided in this District. In January 2018, Plaintiff invested in the Latium ICO by electronically transmitting $25,000 U.S. dollars to Defendants in exchange for LATX tokens. He continues to hold his investment.

7.      Defendant Latium Network, Inc. is a privately held Delaware corporation with its principal place of business located in Madison, Mississippi. According to the Delaware Secretary of State Division of Corporations, Latium was incorporated on September 21, 2017. Latium launched the Latium ICO, maintains the Internet website https://latium.org/, and is the operating entity for the Latium tasking platform.

8.      Defendant David Johnson is the founder and project architect of Latium. He has served as Latium's Chief Executive Officer since March of 2014. According to Defendant's LinkedIn profile, he is also a co-founder of two online entities dealing in the exchange of foreign currencies: Forexrazor.com, founded in 2007, and Cashbackforex.com, founded in 2008. He has also been the owner of Excel Markets, Inc., a foreign exchange brokerage firm, since 2010. Johnson is a citizen of the State of Mississippi.

9.     Defendant Matthew Carden is a Co-Founder of Latium and has served as its Chief Commercial Officer since March of 2014. Carden is a citizen of the State of Mississippi.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of Section 5 of the Securities Act.

11.     This Court also has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, and it is a class action in which some members of the class are citizens of states other than the states in which Defendants are incorporated, maintain a principal place of business, or domiciled. Diversity jurisdiction exists because Plaintiff is a citizen of New Jersey and Defendants are citizens of Delaware and Mississippi.

12.     This Court has personal jurisdiction over Defendants because Defendants either conduct business in this District or are present in this District for jurisdictional purposes. Defendants have sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Defendants solicited investors in this District, including Plaintiff, to participate in the Latium ICO and reaped large sums of money or valuable cryptocurrency from those investors.

13.     Defendants have purposefully availed themselves of the benefits of operating in this jurisdiction, and this Court may exercise personal jurisdiction over Defendants.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 22 of the Securities Act, 15 U.S.C. § 77v, because: (a) the conduct at issue took place and had an effect in this judicial District; (b) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, as several of the Latium ICO investors reside in the State of New Jersey; and (c) Defendants have received substantial compensation and other transfers of money by transacting business in this District and engaging in activities that have an effect in this District.

## FACTUAL ALLEGATIONS

### 1. The Offering

15.     To capitalize on the much-publicized exponential gains in widely accepted cryptocurrencies (like Bitcoin and Ether), Latium decided to invent its own new currency for use only within its own platform. Between approximately July 25, 2017 and March 1, 2018, Defendants conducted an initial coin offering during which they received over $17 million by selling LATX tokens.

16.     Defendants offered investors the opportunity to invest in the Latium ICO through a private presale, a limited "white list" sale and five stages of a general sale. Each stage of the general sale had a higher LATX token price than the previous stage, and each stage offered a set number of LATX tokens for sale.

17.    All investments in the Latium ICO were made with either U.S. dollars or the cryptocurrency Ether.

18.    Defendants' stated purpose of the Latium ICO was to raise capital for the development and maintenance of what they claim will be the world's only tasking platform that blends an artificial intelligence-based user reputation score with a "one-to-many" task relationship structure. According to Defendants, this platform will allow users "to create a task for which they hire one person, or many thousands of people, to complete the task."[1]

19.    The Latium ICO was an offer and sale of securities because Defendants touted, and Plaintiff and other Latium ICO investors reasonably expected, that the value of LATX tokens received in exchange for their investments would grow as the result of Latium's successful launch and cultivation of the tasking platform.

20.    The Securities Act's registration requirements are designed to protect investors by ensuring that they are provided adequate information upon which to base their investment decisions.

21.    Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security. As detailed herein, the Latium ICO was, and has at all times been, an offer and sale of unregistered securities without an exemption, and Defendants are therefore strictly liable under the Securities Act. As a result of Defendants' offer and sale of unregistered securities in violation of federal securities laws, Plaintiff, on behalf of himself and all similarly

---

[1] *What is Latium?*, LATIUM WHITE PAPER, https://latium.org/assets/attachments/whitepaper.pdf.

situated Latium ICO investors, seeks compensatory, injunctive, and rescissory relief, which would provide rescission and repayment of all investments into the Latium ICO, as well as secure and conserve such funds until repayment.

### 2. The Latium Tasking Platform

22.     Adopting the crowdsourcing concept—i.e., the process of enlisting the services of a large number of people from the Internet to obtain goods or services—Latium proposed the development of an innovative tasking platform where people can create tasks for others to complete in exchange for compensation.[2]

23.     Latium's website advertises that it will be "the first and only tasking platform to incorporate an automated rating system in tandem with a one-to-many task relationship structure," which will "allow a user to create a task for which they can hire one person, or many thousands of people, to complete the task."[3]

24.     According to Defendant David Johnson, Latium's Co-Founder and Chief Executive Officer, "[t]he Latium platform revolutionizes how people earn money and opens up access to the cryptocurrency market to anyone seeking income, including those people who might not know anything about cryptocurrency."[4]

25.     Latium claims that its blockchain-based tasking platform will provide a "trustless environment where all participants have transparency in whom they are working with." Users of Latium's platform will be able to create tasks, select the

---

[2] *Gig Economies & Blockchain Technology: The Evolving Story of Latium*, MEDIUM, Jan. 3, 2018, https://medium.com/@kevinsteele_69114/gig-economies-blockchain-technology-the-evolving-story-of-latium-5e89193d0f36.

[3] *Latium*, https://latium.org/.

[4] *The Latium Platform and Token Sale*, MEDIUM, Oct. 27, 2017, https://medium.com/@support_23187/the-latium-platform-and-token-sale-c02a8a77da5.

desired applicants, verify that a task has been completed to specified standards, and pay with Latium's own cryptocurrency.[5]

26. Latium's tasking platform supports both "Digital" and "In-Person" tasks. Digital tasks may include hiring people to drive traffic to an online petition or to complete an online survey. In-Person tasks, on the other hand, would include posting an event such as the grand opening of a new restaurant and hiring people to attend for a reward.[6]

27. While other company websites rely on user reviews and other rating systems to create trust with new potential clients, Latium's tasking platform envisions a proprietary reputation system that "takes human opinion out of the equation by creating a concise and automated system." User scores range from 0 to 1000 based on numerous data points that are systematic in nature, including the number of jobs completed, hire rate, payment time, and task value. Purportedly similar to the U.S. FICO credit score system, Latium's reputation system provides users with a "simple single number" that can be evaluated quickly without the need to conduct additional research.[7]

28. Latium created a limited number of LATX tokens to serve as the exclusive form of currency and payment on the tasking platform.

29. Defendants had created a cryptocurrency for a previous project, the LAT token. On September 29, 2017, Defendants informed investors that although

---

[5] *What is Latium?*, LATIUM WHITE PAPER, *supra* n.1.

[6] *Latium*, https://latium.org/.

[7] *Features*, LATIUM WHITE PAPER, *supra* n.1.

the old LAT tokens were no longer supported in the Latium platform, any current LAT holders could transfer their LAT tokens into new LATX tokens.[8]

30.     When investors inquired why Defendants created the new LATX cryptocurrency instead of using the old LAT tokens, Defendants told investors that the new LATX token would generate better financial returns on their investment.

31.     In an online cryptocurrency forum, Defendants stated, "[w]e felt that restructuring the token into a new one that has a lower purchase price will allow investors to earn more on their purchase. The lower initial purchase price of LATX will provide investors with a chance to earn more without the token having to go up substantially in price."[9]

32.     One of Latium's stated goals is to open up access to the cryptocurrency market to a broader public. Latium could have accomplished its stated goal by simply creating a tasking platform that accepts existing cryptocurrency as payment—the same way Latium itself accepted the cryptocurrency Ether in exchange for investment in its ICO.

33.     Instead of creating that type of system, however, Latium built in an additional condition to using its platform by requiring investors to purchase LATX tokens.

34.     Most operators of tasking websites and on-demand job platforms only earn money when customers use their service, and then they earn a fee on each

---

[8] *Latium Tasking Platform and Token Sale*, BITCOIN FORUM, https://bitcointalk.org/index.php?topic=2135403.80.
[9] *Id.*

transaction. Latium has locked in its profit on the front end by collecting over $17 million in ICO capital.

35.     Latium will have made over 17 million dollars regardless of whether it ever completes its platform—which it claims will limit users to transactions in its LATX tokens.

### 3. The Investment: the Latium Initial Coin Offering

36.     In 2017, before the Latium tasking platform was available to the public, Defendants began marketing the Latium ICO and LATX token sale with the stated purpose of raising money to fund the development and maintenance of the Latium tasking platform.[10]

37.     Defendants administered the Latium ICO in several stages: (a) a private presale; (b) a limited whitelist sale; and (c) a general sale. The whitelist and general phases of Latium's ICO offered a total of 180 million available LATX tokens for purchase. *See* Figure 1 below.[11] Any LATX tokens that were not sold during the ICO were burned, thereby diminishing the total supply available in the market.

---

[10] *Blockchain Tasking Platform Latium Launches Innovative ICO*, CCN, Nov. 22, 2017, https://www.ccn.com/blockchain-tasking-platform-latium-launches-innovative-ico/.
[11] *Latium*, ICO DROPS, https://icodrops.com/latium/.



Figure 1.

38.    In July 2017, Defendants began offering LATX tokens for sale in connection with the Latium ICO. In the first phase of the ICO known as the private "presale," Defendants sold a total of 100,730,550 LATX tokens at a fixed rate of 10,000 LATX per Ether to investors.[12] In the presale stage alone, investors forked over the equivalent of at least two million dollars.

39.    On October 18, 2017, Defendants announced that Latium was accepting applications to participate in its limited "whitelist" stage of the LATX token sale.[13]

---

[12] *Funding Breakdown*, LATIUM WHITE PAPER, *supra* n.1.
[13] *Latium Project*, FACEBOOK, https://www.facebook.com/LatiumProject/.

40.     From November 15 to November 27, 2017, Defendants held the whitelist stage of the LATX token sale; they have not disclosed the amount invested during that phase of Latium's fundraising.

41.     On November 28, 2017, Defendants announced the general sale phase of the Latium ICO was open to the public and U.S. citizens, and that it would continue through March 1, 2018.[14]

42.     The general sale phase of the Latium ICO was divided into five stages at progressively higher prices. Each stage offered a set number of LATX tokens for sale.

43.     Latium's ICO pricing structure was designed to entice and reward early investments. *See* Figure 2 below.[15]



Figure 2.

---

[14] *The LATX General Sale Opens Today*, MEDIUM, Nov. 28, 2017, https://medium.com/@support_23187/the-latx-general-sale-opens-today-c39a54346ee0.
[15] *The Evolving Story of Latium*, *supra* n.2.

44.     During the ICO, Defendants had a program in place to encourage investors to solicit ICO investments from other investors by promising users a commission of 5% of all LATX tokens purchased by investors they referred.[16]

45.     As an additional way to promote the Latium ICO with investors, Defendants created its "Next Buyer Bonus" system. The Latium bonus system rewarded the "very next buyer" of LATX tokens in the ICO with additional tokens based on the value of the investment.[17] *See* Figure 3 below.



Figure 3.

---

[16] *Latium Project*, Facebook, *supra* n. 13.
[17] *Latium—One To Many Task Management and A Noteworthy ICO*, Dec. 7, 2017, https://medium.com/@anne_hashaway/latium-one-to-many-task-management-and-a-noteworthy-ico-2bd4a4167f57.

46.     Internet websites covering the Latium ICO reported on the bonus system and the value of the Latium ICO and LATX token as lucrative investment opportunities. One article reported, "[c]urrently 1ETH = 2k LATX which means if you really make use of this system and time your buys right you could be looking at instantaneous gains of near 100% (or more depending if you can nail a large bonus) when this thing hits the market."[18]

47.     As a result of Defendants' marketing and publicity efforts, the Latium ICO was incredibly successful and profitable. While Latium's ICO and LATX token sale was scheduled to end by March 1, 2018, Defendants reached their financial goals and closed the ICO in mid-January 2018.

48.     In a January 15, 2018 Internet post, Defendants announced that the LATX token sale was closed, thanked investors for their support in the Latium ICO, and invited interested investors to add their names to an ongoing waitlist for additional LATX tokens.[19]

49.     In late January 2018, Defendants publicly disclosed the following Latium ICO and platform statistics: (a) there were over 12,000 individual "holders" (i.e., investors) of LATX tokens; (b) Latium.org, the website that maintains and operates the Latium tasking platform, had over 40,000 registered users; and (c) during its peak period, there were nearly 30,000 active users on the Latium platform

---

[18] *Id.*
[19] *What's in Store for Latium: A Post Token Sale Announcement*, MEDIUM, Jan. 15, 2018, https://medium.com/@support_23187/whats-in-store-for-latium-a-post-token-sale-announcement-9fef60c45095.

in a single day.[20]

### 4. Plaintiff's Investment in the Latium ICO and Purchase of LATX Tokens

50. Plaintiff invested in the Latium ICO on January 12, 2018 by electronically transmitting approximately $25,000 U.S. dollars to Defendants. In exchange for Plaintiff's $25,000 investment in the Latium ICO, Plaintiff received 208,333.33 LATX tokens ($0.12 per LATX token purchased) in his Latium online account.

51. On January 12, shortly after making his investment, Plaintiff received an email from Defendants asking Plaintiff to submit Know Your Customer (KYC) information, including: (a) a valid photo identification or passport; and (b) proof of residence (e.g., bank statement, credit card bill, utility bill, government letter).

52. On January 26, Plaintiff received another email from Defendants thanking participants in the Latium ICO and LATX token sale. Defendants' email exclaimed that as a result of the Latium ICO, there were over 12,000 LATX token investors, which made LATX the most widely distributed token of its size.

### 5. Defendants' Efforts to List the LATX Token on External Cryptocurrency Exchanges

53. During the Latium ICO, the LATX token was not listed on any cryptocurrency exchange. Investors who received LATX tokens in exchange for their monetary investments in the Latium ICO had to rely on Defendants to secure a cryptocurrency exchange for trading in the future.

---

[20] *Showcasing Statistics, Sales & Specific Data*, MEDIUM, Jan. 29, 2018, https://medium.com/@support_23187/showcasing-statistics-sales-specific-data-bda006bd3c67.

54. Shortly after the Latium ICO ended, in February 2018, Defendants announced that Latium was in discussions with several cryptocurrency trading exchanges.[21]

55. On February 12, Defendants reported that Latium's LATX token would be listed on Bit-Z's token voting platform from February 13 to 20. Bit-Z is one of the world's largest digital asset trading exchanges with an average 24-hour volume in excess of $120 million.[22]

56. Using Latium's already existing network of investors who handed money over for the Latium ICO, Defendants offered an incentive to them in exchange for their votes in favor of listing LATX on Bit-Z's exchange. Defendants created a reward program of 500,000 LATX tokens to be distributed among supporters who voted in favor of Latium.[23]

57. Also in February 2018, Defendants responded to Latium community concerns about securing listings on cryptocurrency exchanges by assuring investors that Defendants: (a) emailed or submitted applications to the top 50 exchanges; (b) were in "direct conversations" with multiple exchanges; and (c) had no issue paying for listings on exchanges and "expect[ed] to do so."[24]

58. On March 9, 2018, Defendants announced that Latium's new LATX token was successfully listed and available for trading on the YoBit.Net

---

[21] *Weekly Update: Bit-Z Exchange Voting*, MEDIUM, Feb. 12, 2018, https://medium.com/@support_23187/weekly-update-bit-z-exchange-voting-73aa6a9f6386.
[22] *Id.*
[23] *Id.*
[24] *Latium Tasking Platform*, BITCOIN FORUM, https://bitcointalk.org/index.php?topic=2236856.1420.

cryptocurrency exchange.[25] Defendants' Facebook page exclaimed that investors could "[b]uy and sell Latium (LATX) on YoBit Exchange!"[26]

59.     Defendants have continued their efforts to have the LATX token listed on other cryptocurrency exchanges. On April 18, 2018, Defendants announced that the LATX token was listed and available for trading on LiveCoin, a top 50 cryptocurrency exchange.[27]

60.     In an April 21, 2018 live question and answer session with Defendant David Johnson, Latium's Chief Executive Officer, Defendants disclosed their goal of listing the LATX token on *four to ten* cryptocurrency exchanges by the time the production version of Latium's tasking platform is publicly released, which is expected to be sometime in the second quarter of 2018.[28]

61.     Most recently on May 24, 2018, Defendants announced that the LATX token was successfully listed and available for live trading on HitBTC, a multi-currency exchange platform with over 300 cryptocurrencies.[29]

### 6. *Defendants Create an Internal Exchange on the Latium Platform Where Users Can Trade Cryptocurrencies*

62.     On April 27, 2018, Defendants announced that an update to the Latium platform featured an internal exchange for the benefit of users who wish to buy or sell LATX tokens or "desire to transfer LATX to another user, even outside of the

---

[25] *Latium Project*, FACEBOOK, *supra* n. 13.
[26] *Id.*
[27] *LiveCoin + Latium: Listing Announcement*, MEDIUM, Apr. 18, 2018, https://medium.com/@support_23187/livecoin-latium-listing-announcement-7a9bce3fd2c2.
[28] *Latium LIVE AMA w/ CEO & Co-Founder David Johnson*, YOUTUBE, Apr. 21, 2018, 1:17:39-59, https://www.youtube.com/watch?v=VzHAccOOszU.
[29] *Latium Project*, FACEBOOK, *supra* n. 13.

contract tasking system." Defendants claim that Latium's internal exchange operates in a similar manner to other over the counter exchanges in the marketplace.[30]

63.    Latium's internal exchange allows users to actively trade LATX tokens for other cryptocurrencies such as Bitcoin or Ether. *See* Figure 4 below.[31] Although there are currently only three cryptocurrencies available for trading on the internal exchange, Latium has promised users that there will be many additional tokens accessible for trading in the future.[32]



Figure 4.

64.    Defendants openly admit that its internal exchange "further drives the

---

[30] *Beta Update: Internal Exchange,* MEDIUM, Apr. 27, 2018, https://medium.com/ @support_23187/beta-update-internal-exchange-bf8c313452b9

[31] *Internal Exchange Development,* MEDIUM, May 30, 2018, https://medium.com/ @support_23187/internal-exchange-development-1ccb0d75cfd7.

[32] *Id.*

liquidity of the LATX token" by providing users with several repository exchange trading options.[33]

65.     As a direct result of Defendants' efforts, the LATX token is now available for trading on three cryptocurrency exchanges as well as on Latium's internal exchange.

### 7. *LATX Tokens Are "Investment Contracts"*

66.     Under the federal securities laws, the definition of a security includes an "investment contract." The United States Supreme Court has defined "investment contract" as a contract, transaction, or scheme whereby a person invests his or her money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. *S.E.C. v. Howey*, 328 U.S. 293, 299 (1946).

### a. *Investment of Money*

67.     Plaintiff and members of the Class invested their money in the Latium ICO. Investors paid either U.S. dollars or Ether to purchase their LATX tokens from Defendants in the Latium ICO. Such an investment is the type of contribution of value that creates an investment contract.

### b. *Common Enterprise*

68.     By purchasing LATX tokens, Plaintiff and the Class joined Defendants in the "common enterprise" of establishing the Latium tasking platform, where LATX tokens would be the established and sole currency.

---

[33] *Internal Exchange: Application to the Latium Tasking Platform*, MEDIUM, Apr. 18, 2018, https://medium.com/@support_23187/internal-exchange-application-to-the-latium-tasking-platform-d2ea5eed9bc1.

### c.     *Expectation of Profit*

69.     Through their words and actions, Defendants led investors in the Latium ICO to expect a profit from the purchase of LATX tokens. Defendants introduced LATX tokens as the exclusive form of payment on the Latium tasking platform and made clear to potential investors that the tokens would be issued in a limited supply. Employers who wish to post tasks for other users to complete must purchase LATX tokens to create new tasks in the system.[34] Potential investors logically concluded that the development and growth of the tasking application would create additional demand for LATX tokens and increase their value.[35]

70.     Defendants have publicly made comments about the profitability of investing in the Latium ICO and LATX token. When asked by cryptocurrency news source Bitcoin Chaser why investors should participate in the Latium ICO, Defendants described the Latium tasking platform as a "unique investment opportunity" particularly in tandem with the limited supply of LATX coins.

71.     Defendants have openly acknowledged that the Latium LATX token was structured with a lower initial purchase price to "provide investors with a chance to earn more without the token having to go up substantially in price."[36]

72.     As one cryptocurrency news source highlighted, "even if you decide to totally abstain from actually using the platform, you can benefit from investing into [*sic*] Latium token." Given that LATX tokens must be purchased to access and use

---

[34] *What is Latium?*, LATIUM WHITE PAPER, *supra* n.1.
[35] *Interview With Latium*, BITCOIN CHASER, https://bitcoinchaser.com/ico-hub/latium.
[36] *Latium Tasking Platform and Token Sale*, *supra* n.8.

the Latium tasking platform, there is a demand for them on cryptocurrency exchanges. Thus, "[y]ou can buy the token during the crowdsale and sell it later for a premium (in the cryptoworld, premium can be very high – check the NXT coin performance on the coinmarketcap)."[37]

73.    Defendants have explained the direct relationship between the success of the tasking platform and the value of the LATX token. In an "Ask Me Anything" session with Defendant David Johnson, when discussing whether Defendants would eventually buyback Latium LATX tokens to increase price, Johnson stated that "our focus again, ya know, it's just not short-term pricing. It's not our focus. Ya know, so, I believe we if continue on the path that we're on, we continue to develop and we build a good product, and we market that product, I believe the long-term price will follow the product itself."[38]

74.    Defendants have encouraged investors to focus on the profit potential of LATX tokens by seeking to have LATX tokens listed on cryptocurrency exchanges and making their efforts and successes known to potential investors. Defendants admitted that Latium: (a) emailed or submitted applications to the top 50 exchanges; (b) has been in direct conversations with numerous exchanges; (c) arranged for LATX tokens to be voted on Bit-Z's exchange for a possible listing; (d) successfully listed its LATX token on YoBit's, LiveCoin's, and HitBTC's cryptocurrency exchanges for active trading; (e) has a goal of getting its LATX token listed on four to ten

---

[37] *Latium FAQ*, MEDIUM, Nov. 15, 2017, https://medium.com/arborea-my-utopia/latium-faq-b4e560e66360.
[38] *Latium LIVE AMA w/ CEO & Co-Founder David Johnson*, *supra* n.28, 1:13:10-40.

cryptocurrency exchanges by the time the production version of Latium's tasking platform is released to the public; and (f) continues to develop and build the Latium tasking platform system, which uses LATX tokens as its exclusive form of payment.

### d. Investors' Realization of Profits Depends on the Efforts of Defendants

75.     When Plaintiff and members of the Class invested in LATX tokens, the Latium tasking platform had only limited functionality, and it had not been launched for public use. Plaintiff and the Class had no power to bring about the full implementation of the platform, and they relied on Defendants' managerial and entrepreneurial efforts to make the platform fully available to the public, as Latium had promised. As of the time of the filing of this complaint, the platform is still in its Beta version and is not fully functional.

76.     Defendants have sole control over the money they raised through the ICO and the management of those funds in connection with the Latium tasking platform project. Defendants' White Paper disclosed to investors that the Latium tasking platform project budget will be allocated as follows: 40% development, 30% marketing, 15% security, 10% operations, and 5% legal.[39] Investors had no input into how the funds raised in the ICO should be allocated or how they actually were (and are being) spent.

77.     Latium ICO investors had to rely on Defendants to: (a) market the Latium ICO and generate publicity by posting on message boards, social media, and other outlets, and (b) raise the necessary funding to finance the tasking platform

---

[39] *Project Budget*, LATIUM WHITE PAPER, *supra* n.1.

project.

78.     Now that Defendants claim to have raised their target amount of capital, investors still are reliant on Defendants to: (a) manage the funds that have been raised from Latium ICO investors, (b) develop and build the tasking platform, and (c) market the tasking platform concept to potential users and seek mass adoption of the Latium application.

79.     Investors are forced to similarly rely on Defendants to maintain the LATX token listing on cryptocurrency exchanges that allow for active trading.

80.     If and when the Latium tasking platform is brought to full functionality and public availability, Latium investors will continue to rely on the managerial and entrepreneurial efforts of Defendants to maintain the platform. Defendants alone control the essential platform functions that determine the value of the investors' tokens: (a) a client's ability post tasks, select applicants, and verify that a task has been completed; (b) a client's ability to apply for tasks, upload task-related documents and files, mark a task as completed, and request payment; (c) the proprietary reputation system that tracks and rates clients by assigning a FICO-like score to each client; (d) the assessment of fees to clients who post tasks on the platform; (e) the proprietary physical task locater that identifies available tasks in a client's vicinity; (f) the payment transfer system; (g) a profile management system that enables users to create editable profiles with avatars and biographical details; (h) a general and task-related chat system; (i) a task search system that enables clients to find tasks according to their interests; and (j) adopting and maintaining

reliable security measures.

81.     Investors in the Latium ICO have no power or control over their investments once they hand their payment over to Defendants. Defendants control all pertinent information about the company, manage the development of the tasking platform, and choose what types of information to provide to investors and when that information is disseminated. All information received by Latium ICO investors— before they invested, while they hold their investments, and until the time an investor sells LATX tokens—comes from Defendants.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this class action lawsuit on behalf of himself and the proposed Class of similarly situated investors in the Latium ICO, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

83.     Plaintiff seeks certification of the following Class:

> All Latium investors who, between July 25, 2017 and March 1, 2018, transferred monies or cryptocurrencies to Latium in furtherance of Latium's ICO.

> Excluded from the Class are Defendants and their parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

84.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

85.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that their individual joinder is impracticable. On information and belief, there are in excess of 10,000 Class members. The precise number or identification of members of the Class is presently unknown to Plaintiff, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

86.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual members of the Class. These common questions of law or fact include, but are not limited to, the following:

a) Whether Defendants offered and sold unregistered securities, in violation of federal securities laws, to Plaintiff and the Class during the Latium ICO;

b) Whether Plaintiff and other Class members will suffer irreparable harm if such securities laws violations are not remedied; and

c) Whether the Class is entitled to injunctive, compensatory, or rescissory relief as a result of Defendants' wrongful conduct as alleged herein.

87.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other members of the Class. Similar or identical statutory law violations and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

88.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendants in violation the federal securities laws as complained of herein. Further, the damages of each member of the Class were caused directly by Defendants' wrongful conduct in violation of the laws as alleged herein.

89.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because he is a member of the Class and his interests do not conflict with the interests of the other members of the Class he seeks to represent. Plaintiff has also retained counsel competent and experienced in complex and class action litigation. Plaintiff and his counsel intend to prosecute this action vigorously for the benefit of all members of the Class. Accordingly, the interests of the members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

90.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class as a whole.

91.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS ALLEGED

### COUNT I
### Violation of the Securities Act
### (Against Defendant Latium)

92.     Plaintiff repeats and re-alleges each and every allegation above as if set forth herein.

93.     Section 5(a) of the Securities Act prohibits the direct or indirect use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to actually sell securities, or to carry or cause such securities to be carried through the mails or interstate commerce for the purpose of sale or for delivery after sale, unless a registration statement is in effect as to that security. 15 U.S.C. § 77e(a).

94.     Section 5(c) of the Securities Act makes it unlawful for any person to directly or indirectly make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or buy through the use or medium of any prospectus or otherwise any security, unless a registration has been filed as to such security or the security is exempt from registration. 15 U.S.C. § 77e(c).

95.     Section 12(a)(1) of the Securities Act grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person:

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(2).

96.     From approximately July 25, 2017 through March 1, 2018, in connection with the Latium ICO, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direction violation of the Securities Act.

97.     Defendants are "sellers" within the meaning of 15 U.S.C. § 77e because Defendants or their agents solicited Plaintiff's and the Class' investments in the Latium ICO.

98.     The Latium ICO was a sale of unregistered securities under controlling federal law. LATX tokens exhibit the following particular benchmarks of a security under the *Howey* test: (a) in order to receive any LATX tokens, an investment of money in the form of U.S. dollars or the digital currency Ether was required; (b) the investment of money was made into the common enterprise that is Defendants' potential blockchain-based tasking platform; and (c) any potential returns on the investment is entirely reliant on Defendants' ability to launch and grow the Latium tasking platform.

99.     The Latium ICO was not a transaction exempt from the registration requirements of Section 5.

100.    Defendants' tasking platform is a horizontally common enterprise because Latium ICO investments were pooled and under the control of Defendants.

101.    To purchase LATX tokens, Latium ICO investors deposited either U.S. dollars or the cryptocurrency Ether into Defendants' online account—a common pool of funds that commingled each investor's investment.

102.    Defendants told Latium ICO investors that their assets would be pooled together and all of the funds initially raised would be invested in the company and the development of the tasking platform. Defendants' White Paper unambiguously states that "[f]unds raised during the [LATX] token sale will be used for the development and maintenance of the Latium system" and allocated as follows: 40% development, 30% marketing, 15% security, 10% operations, and 5% legal.[40]

---

[40] *Project Budget*, LATIUM WHITE PAPER, *supra* n.1.

Moreover, Defendants had, and continue to have, sole and exclusive control over the allocation and use of the funds raised in the Latium ICO.

103.     Profits among the investors are also expected to be divided proportionately. The number of LATX tokens purchased by investors was dependent upon the size of an investment and the price paid. An investor's return on a Latium ICO investment—potential profits stemming from the future valuation of LATX tokens—is directly proportional to the amount of an investor's financial stake and number of LATX tokens owned.

104.     Defendants' tasking platform is a vertically common enterprise because any profits investors may receive from their investments are entirely dependent on Defendants' efforts.

105.     Further, the success of Latium ICO investors' fortunes are directly tied to Defendants' profits. In connection with the Latium ICO, Defendants' White Paper disclosed to investors that 45,000,000 LATX tokens (15% of the total supply available) will be held by Latium and used as financial compensation for executives' equity.[41] Accordingly, given the link between the success of investors' Latium ICO investments and the financial compensation paid to Defendants—both in the identical form of LATX tokens—the fortunes of investors and Defendants are sufficiently correlated so as to establish vertical commonality.

106.     No registration statements have been filed with the United States Securities and Exchange Commission or have been in effect with respect to any of

---

[41] *Overview of Token Structure*, LATIUM WHITE PAPER, *supra* n.1.

the offerings alleged herein. Further, there are no exemptions from registration available.

107.   Defendants' White Paper explicitly states that "Latium tokens have not and will not be registered or filed under the securities laws or regulations of the United States."[42]

108.   By reason of the foregoing, Defendants have violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c).

109.   As a direct and proximate result of Defendants' unregistered sale of securities in violation of the Securities Act, Plaintiff and Class members have suffered damages in connection with their respective purchases of LATX securities in the Latium ICO. As such, Defendants are liable to Plaintiff and the Class for rescission, injunctive relief, and compensatory damages.

**COUNT II**
**Violation of the Securities Act**
**(Against Defendants Johnson and Carden)**

110.   Plaintiff repeats and re-alleges each and every allegation above as if set forth herein.

111.   Section 15 of the Securities Act provides for joint and several liability for "controlling persons" who had sufficient power or influence over an entity that violated federal securities laws:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 77k or 77*l* of this title, shall also be

---

[42] *Legal Disclaimers*, LATIUM WHITE PAPER, *supra* n.1.

> liable jointly and severally with and to the same as extent as such
> controlled person to any person to whom such controlled person
> is liable, unless the controlling person had no knowledge of or
> reasonable ground to believe in the existence of the facts by
> reason of which the liability of the controlled person is alleged to
> exist.

15 U.S.C. § 77o(a).

112.   Defendant David Johnson is subject to liability by virtue of his top-level executive position with Latium and his significant influence and supervisory authority over Latium. Johnson is a Co-Founder of Latium and serves as the Chief Executive Officer, which provided him the power to control or influence the company's actions. He is responsible for Latium's day-to-day operations and business management, including its operations and interactions with Plaintiff and Class members. At all relevant times, Johnson has given numerous interviews and made public statements promoting the Latium ICO and tasking platform. As the head of and a controlling person of Latium, Johnson knew of and actively participated in the Latium ICO and the sale of unregistered securities in direct violation of the Securities Act.

113.   As a Co-Founder and Chief Executive Officer of Latium, Defendant David Johnson will be compensated in the form LATX tokens for his efforts in connection with the Latium ICO and tasking platform. Latium's White Paper explicitly states that 45,000,000 LATX tokens, or 15% of the total supply available, will be held by Latium and used to compensate its executives with equity in the company.[43]

---

[43] *Overview of Token Structure*, LATIUM WHITE PAPER, *supra* n.1.

114.   Defendant David Johnson had the power to influence and control, and, indeed, did influence and control, directly or indirectly, Defendant Latium's conduct in offering the LATX token for sale in the Latium ICO, resulting in the violation of federal securities laws. Johnson is a culpable participant in the Latium ICO alleged herein and caused Latium to engage in the acts which give rise to liability under 15 U.S.C. § 77e. Accordingly, Johnson is a "controlling person" of Latium within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

115.   Similarly, Defendant Matthew Carden is subject to liability by virtue of his top-level executive position with Latium and his significant influence and supervisory authority over Latium. Carden is a Co-Founder of Latium and serves as the Chief Commercial Officer, which provided him the power to control or influence with company's actions. He is responsible for Latium's commercial strategy and technical development, working directly with Latium designers and developers to market and advertise Latium's ICO and tasking platform to Plaintiff and Class members. As the head of and a controlling person of Latium, Carden knew of and actively participated in the Latium ICO and the sale of unregistered securities in direct violation of the Securities Act.

116.   As a Co-Founder and Chief Commercial Officer of Latium, Defendant Matthew Carden will be compensated in the form LATX tokens for his efforts in connection with the Latium ICO and tasking platform. Latium's White Paper explicitly states that 45,000,000 LATX tokens, or 15% of the total supply available,

will be held by Latium and used to compensate its executives with equity in the company.[44]

117.   Defendant Matthew Carden had the power to influence and control, and, indeed, did influence and control, directly or indirectly, Defendant Latium's conduct in offering the LATX token for sale in the Latium ICO, resulting in the violation of federal securities laws. Carden is a culpable participant in the Latium ICO alleged herein and caused Latium to engage in the acts which give rise to liability under 15 U.S.C. § 77e. Accordingly, Carden is a "controlling person" of Latium within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

118.   Plaintiff and Class members have suffered damages as a result of David Johnson and Matthew Carden's role as a "controlling person" in Latium's violations of Section 5 of the Securities Act.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment and relief as follows:

A.   Declaring this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel for the Class;

---

[44] *Overview of Token Structure*, LATIUM WHITE PAPER, *supra* n.1.

B.    Declaring the sale of LATX tokens a security under the federal securities laws;

C.    Declaring Defendants offered and sold unregistered securities in violation of federal securities laws;

D.    Declaring that Defendants are liable to Plaintiff and the Class under Sections 12(a)(1) and 15(a) of the Securities Act;

E.    Preliminarily enjoining Defendants from making further transfers or dissipations of the investments raised during the Latium ICO, or using such funds in any further purchases or transactions;

F.    Requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with the Latium ICO;

G.    Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class;

H.    Ordering rescission of the investments made by Plaintiff and the Class relating to the Latium ICO;

I.    Awarding Plaintiff and the Class compensatory damages for the injuries alleged herein;

J.    Awarding Plaintiff the costs of this action, including a reasonable allowance for attorneys' fees and litigation costs and expenses;

K.    Leave to amend this Complaint to conform to the evidence presented at trial; and

L.    Ordering such other and further relief as may be just and proper.

Dated: June 6, 2018            Respectfully submitted,


By: _s/ Eric T. Kanefsky_

Eric T. Kanefsky
*eric@ck-litigation.com*
Samuel S. Cornish
*sam@ck-litigation.com*
Martin B. Gandelman
*mgandelman@ck-litigation.com*
**CALCAGNI & KANEFSKY, LLP**
One Newark Center
1085 Raymond Boulevard, 14th Floor
Newark, New Jersey 07102

- 35 -

Phone: 862.397.1796

Aaron K. Dickey
(*Pro Hac Vice* Application Forthcoming)
*adickey@flintlaw.com*
**FLINT LAW FIRM LLC**
222 East Park Street
Suite 500
Edwardsville, Illinois 62025
Phone: 618.205.2017

***Counsel For Plaintiff And The Class***

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I certify that, to the best of my knowledge, this matter is not subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

Dated: June 6, 2018

By: _s/ Eric T. Kanefsky_

Eric T. Kanefsky
*eric@ck-litigation.com*
Samuel S. Cornish
*sam@ck-litigation.com*
Martin B. Gandelman
*mgandelman@ck-litigation.com*
**CALCAGNI & KANEFSKY, LLP**
One Newark Center
1085 Raymond Boulevard, 14th Floor
Newark, New Jersey 07102
Phone: 862.397.1796

Aaron K. Dickey
(*Pro Hac Vice* Application Forthcoming)
*adickey@flintlaw.com*
**FLINT LAW FIRM LLC**
222 East Park Street
Suite 500
Edwardsville, Illinois 62025
Phone: 618.205.2017

***Counsel For Plaintiff And The Class***